399 F.3d 570
 BARCLAYS INVESTMENTS, INC. as successor of Consolidated Realty Corp.
v.
ST. CROIX ESTATES
v.
Bruce J. Wrobel, Intervenor
Bruce J. Wrobel
v.
Florida Raffles, Inc., F.D.R. Holdings, Inc., George W. Heaton, Richard F. Mazur, St. Croix Estates, Inc., Barclays Investments, Inc., as successor of Consolidated Realty Corp.
Barclays Investments, Inc., Appellant.
 No. 04-2111.
 United States Court of Appeals, Third Circuit.
 Argued December 16, 2004.
 Filed March 1, 2005.
 
 Edward L. Barry (argued), Donovan M. Hamm, Jr., Hamm & Barry, Christiansted, St. Croix, U.S. Virgin Islands, for Appellant.
 Warren B. Cole (argued), Hunter, Colianni, Cole & Bennett, Christiansted, St. Croix, U.S. Virgin Islands, for Appellee.
 Before SLOVITER, FUENTES, and GREENBERG, Circuit Judges.
 GREENBERG, Circuit Judge.
 
 
 1
 This dispute concerns whether a mortgage on a property located on St. Croix in the Virgin Islands secures a note made after the mortgage was satisfied. While this appeal's factual and procedural background is quite intricate, its central legal issue is straightforward: Did the district court properly classify the mortgage as a future advance mortgage? We hold that the record cannot support the district court's legal classification and therefore we will reverse.
 
 I. FACTUAL AND PROCEDURAL BACKGROUND
 
 2
 This appeal results from the adjudication of two consolidated cases, Barclays Investments, Inc. v. St. Croix Estates, Inc., Civ. No. 90-0099 (D.V.I.) (the "Consolidated Realty" action),[1] and Wrobel v. Florida Raffles, Inc, Civ. No. 91-0100 (D.V.I.) (the "Wrobel" action).[2] In Consolidated Realty, Consolidated Realty Corp. ("Consolidated"), predecessor to Barclays Investments, Inc. ("Barclays"), sought a declaration that a deed in which it was the grantor of certain real property in St. Croix was void ab initio and also sought an order directing the recorder of deeds to strike the deed from the public records. In Wrobel, Bruce J. Wrobel sought payment on a promissory note and foreclosure of a mortgage on the real property involved in Consolidated Realty. In addition, Wrobel intervened in Consolidated Realty, asserting his claim against the property.[3] Wrobel was interested in Consolidated Realty because his mortgage was derived from the title that Consolidated sought to invalidate in that case.
 
 
 3
 The real property at the center of this appeal is a luxury residence in St. Croix commonly known as "The Dome." Consolidated held title to The Dome but exchanged it for an interest in commercial property in Florida, transferring The Dome to St. Croix Estates, Inc., a Delaware corporation that George Heaton controlled, by a deed dated July 7, 1989. Consolidated later claimed that Heaton fraudulently induced it to enter into this transaction.
 
 
 4
 St. Croix Estates mortgaged The Dome on September 5, 1989, to secure a loan of $500,000 from James Bouwman and Richard Mazur ("Bouwman and Mazur" or "B & M") to two other Heaton corporations, F.D.R. Steaks, Inc. and Maan, Inc. A promissory note between F.D.R. Steaks and Maan, as obligors, and Bouwman and Mazur, as obligees, accompanied this mortgage. St. Croix Estates, F.D.R. Steaks and Maan were the only mortgagors in the mortgage deed, and F.D.R. Steaks, and Maan, were the only obligors in the note. Though Heaton signed both instruments he did so only as president of the three corporations and not individually.
 
 
 5
 On October 5, 1989, following payment of the note, Bouwman and Mazur executed a satisfaction of the mortgage in favor of St. Croix Estates, F.D.R. Steaks and Maan, but this satisfaction has not been recorded. Instead, Heaton's attorney[4] on October 17, 1989, wrote Bouwman and Mazurs' attorney asking that the mortgage be assigned to Cramer Properties, Inc., a Texas corporation.[5] Bouwman and Mazur complied with this request as they assigned the mortgage to Cramer Properties, without recourse as to liability, on or about October 18, 1989. Nevertheless, on or about November 1, 1989, Bouwman and Mazur executed a second satisfaction of the St. Croix Estates mortgage which was recorded on April 19, 1990. The district court, however, held that this second satisfaction was void. After the assignment to it, Cramer Properties executed its own no recourse assignment of the St. Croix Estates mortgage in blank.
 
 
 6
 Subsequently, Heaton retained Raymond Monacelli, a loan broker, to obtain financing for yet another of his companies, Florida Raffles, Inc.[6] Monacelli then obtained possession of both the B & M and Cramer assignments of the St. Croix Estates mortgage. Wrobel agreed to make a loan to Florida Raffles and that company executed a 60-day promissory note in his favor on or about February 6, 1990, for the principal sum of $212,000.00 evidencing the loan. F.D.R. Holdings, Inc., yet another Heaton company, endorsed the note which Heaton personally guaranteed on a separate document. On February 8, 1990, Monacelli wrote a letter to Wrobel explaining that he was:
 
 
 7
 in possession of an Assignment of that certain mortgage in the original principal amount of $500,000.00 made by St. Croix Estates, Inc., A Delaware corporation, F.D.R. Steaks, Inc., A Florida corporation, and Maan, Inc., a Michigan corporation, mortgagor, in favor of James P. Bouwman and Richard F. Mazur, mortgagee.... I have been authorized to retain said Assignment, and will do so, until such time as that certain note made by Florida Raffles, Inc., in your favor in the amount of $212,000.00 has been paid in full and satisfied.
 
 
 8
 App. at 187. The letter did not say that Wrobel's note would be secured by a lien on the property represented by the mortgage and did not even state what would happen to the mortgage and the assignment if Florida Raffles defaulted on the loan. In fact, the letter did not indicate that Monacelli had the mortgage.
 
 
 9
 Florida Raffles, F.D.R. Holdings, and Heaton all defaulted on the Wrobel loan. Following the default, Monacelli delivered the B & M and Cramer assignments to Wrobel and the blank Cramer assignment was completed to reflect its assignment to Wrobel. Thereafter it was recorded on August 15, 1990. Neither of the parties on this appeal suggests that Monacelli acted improperly in delivering the assignments to Wrobel.
 
 
 10
 While Wrobel was confronted with a default on his note, Consolidated pursued its own grievances against Heaton and his companies. Consolidated sued St. Croix Estates on May 11, 1990, and eventually others, seeking to rescind the real property transaction conveying The Dome from Consolidated to St. Croix Estates, alleging that Heaton by fraudulent representations induced Consolidated to make the conveyance. This complaint marked the beginning of the Consolidated Realty action. As we have indicated, Wrobel later intervened in this action, asserting a claim against The Dome resulting from the default on his loan and the security he believed that the St. Croix Estates mortgage provided him. Wrobel sued Florida Raffles and other defendants on April 18, 1991, seeking payment on his loan and also seeking foreclosure on The Dome, arguing that his rights to that real property were superior to those of Consolidated. This complaint marked the start of the Wrobel action. In Wrobel, the district court, on October 9, 1992, granted partial summary judgment in Wrobel's favor for $212,000 plus interest against Florida Raffles, F.D.R. Holdings and Heaton but not against St. Croix Estates. App. at 185-86. That judgment reserved for later proceedings a determination of the priority of the claims of Wrobel, St. Croix Estates and Consolidated Realty to the Dome.
 
 
 11
 The disputes partially were resolved when Consolidated entered into an agreement with St. Croix Estates and other parties that we need not list on or about March 20, 1995. Through the agreement the parties recognized a $6,779,588.79 judgment Consolidated had obtained against Heaton in the United States District Court for the Middle District of Florida,[7] agreed to void the deed for The Dome from Consolidated to St. Croix Estates, and also agreed that "the `Heaton Group' hereby transfers, quit claims and conveys to Consolidated Realty Corp. any and all right, title and interest they may have in and to [The Dome] in fee simple forever." App. at 199.
 
 
 12
 At this point, Wrobel held a judgment for the amount of the promissory note which he sought to satisfy via foreclosure of the St. Croix Estates mortgage of The Dome, even though the monetary judgment was not against St. Croix Estates, and Consolidated held a judgment against Heaton and an interest in The Dome that it obtained via its agreement with St. Croix Estates. The parties turned to the district court to define and prioritize their interests in The Dome. On September 27, 2002, following a bench trial on a paper record, the district court issued a memorandum opinion in the consolidated action and on October 7, 2002, the district court issued a judgment of foreclosure in favor of Wrobel against St. Croix Estates and Consolidated.
 
 
 13
 In its memorandum opinion the district court concluded that Wrobel held a valid and enforceable future advance mortgage on The Dome and that he thus held a title superior to Consolidated's in the property. Consolidated filed an appeal of the October 7, 2002 order to this court on October 22, 2002, but later filed a motion on notice to Wrobel's attorney seeking an order dismissing the appeal on the basis that it was premature.[8] Consolidated extensively briefed its motion. Wrobel did not oppose the motion or suggest, at least in a document on record in this court, that the appeal was not premature and the clerk of this court dismissed the appeal on May 7, 2003. In view of Wrobel's failure to object to the motion for dismissal the clerk acted without referring the motion to a panel of this court.
 
 
 14
 On May 19, 2003, Consolidated filed a motion in the district court for entry of certain orders. Consolidated asked the district court to enter orders for the purposes of entering a final judgment in Consolidated Realty rescinding the conveyance of The Dome from Consolidated to St. Croix Estates and to substitute Barclays, as successor to Consolidated, as a party in its place. Wrobel opposed Consolidated's motion, arguing that the district court's October 7, 2002 order and accompanying September 27, 2002 opinion "resolved all issues in both of the underlying civil actions and was a final order in both cases." App. at 401.
 
 
 15
 In response to Consolidated's motion, on March 19, 2004, the district court substituted Barclays for Consolidated, declared the conveyance from Consolidated to St. Croix Estates voidable, but concluded that Wrobel's mortgage on The Dome is enforceable and superior to Consolidated's interest. Barclays, as successor to Consolidated, filed an appeal to this court on April 16, 2004.
 
 II. DISCUSSION
 
 16
 A. Do We Have Jurisdiction Over this Appeal?[9]
 
 
 17
 Wrobel asserts that Barclays' appeal is not timely because the district court's October 7, 2002 judgment of foreclosure was a final judgment under 28 U.S.C. § 1291 and measured from that date the appeal undoubtedly would be late. While Barclays does not deny that the October 7, 2002 judgment of foreclosure, if it stood alone, would be a final judgment, it maintains that the district court entered its judgment of foreclosure only in Wrobel and that it did not enter a final judgment in Consolidated Realty until March 19, 2004. Because the district court consolidated the two actions on November 4, 1999, according to Barclays "entry of a final judgment in each was a prerequisite to appellate jurisdiction" in both cases and therefore its current appeal is timely. Appellant's reply br. at 1. We point out that if the time for appeal in both cases is measured from entry of the March 19, 2004 order then the appeal clearly would be timely.[10]
 
 
 18
 The operative legal principle with respect to the timeliness of this appeal is clear. We set forth the controlling rule in Bergman v. City of Atlantic City, 860 F.2d 560, 567 (3d Cir.1988), in which we held that "where two or more actions are consolidated for all purposes of discovery and trial, a judgment in one of those actions is not appealable either until all of the consolidated actions have been resolved, or until the district court grants a motion for certification under Rule 54(b)."[11]
 
 
 19
 The judgment of foreclosure of October 7, 2002, did not resolve Consolidated's request in Consolidated Realty for a declaration that the conveyance of The Dome from Consolidated to St. Croix Estates was void ab initio and that the deed be struck from the records or set aside. Indeed, the October 7, 2002 judgment of foreclosure does not mention this issue. Moreover, the district court acknowledged in its March 19, 2004 order in response to Consolidated's motion for entry of orders that it had "never dismissed the [Consolidated Realty] Complaint nor entered any declaration concerning the conveyance." App. at 4a. Similarly, the district court's September 27, 2002 opinion, setting forth the basis for the October 7, 2002 judgment, does not contain a discussion of the property conveyance from Consolidated to St. Croix Estates.[12] Furthermore, the district court's issuance, at least in part, of the orders that Consolidated requested after the court entered the judgment of foreclosure demonstrates that the district court had not resolved all of the issues between those parties when it entered the judgment of foreclosure.
 
 
 20
 Inasmuch as the October 7, 2002 judgment of foreclosure left claims unresolved in Consolidated Realty, the judgment did not resolve Consolidated Realty fully even if it resolved Wrobel, the case with which it was consolidated. Under Bergman, in these circumstances, the judgment in Wrobel was not appealable until the resolution of Consolidated Realty inasmuch as the district court consolidated the two actions without limitation of purpose. Bergman, 860 F.2d at 567. In fact, the district court did not limit the consolidation of the two cases and we see no reason to treat the two actions as distinct for purposes of appeal. Therefore, under Bergman, this appeal is timely and we may assert jurisdiction under 28 U.S.C. § 1291 and 48 U.S.C. § 1613.[13]
 
 
 21
 B. Did Wrobel Hold a Future Advance Mortgage?
 
 
 22
 We now turn to the central substantive legal issue on this appeal. Barclays contends that the district court erred in concluding that Wrobel held a future advance mortgage on The Dome and in relying on that legal basis to grant a judgment of foreclosure to Wrobel. Of course, if Barclays is correct then, at least insofar as Wrobel is concerned, to the extent he is relying on the St. Croix Estates mortgage as a future advance mortgage Barclays' title is valid and the foreclosure was invalid. We review this legal determination under Virgin Islands law de novo.[14] Haugh v. Allstate Ins. Co., 322 F.3d 227, 234 (3d Cir.2003) (citing Salve Regina College v. Russell, 499 U.S. 225, 231, 111 S.Ct. 1217, 1221, 113 L.Ed.2d 190 (1991), to explain that "[o]f course, a court of appeals makes a de novo review of a district court's determination of state law"); James v. Zurich-Am. Ins. Co. of Illinois, 203 F.3d 250, 254-55 (3d Cir.2000).
 
 
 23
 The district court relied on 28 V.I.Code Ann. § 1032 (1996), and several sections of the Restatement (Third) of Property (Mortgages) (1997) to reach its legal conclusions. Relying on these sources, the district court concluded that:
 
 
 24
 By furnishing Heaton with an assignment of the [St. Croix Estates] Mortgage, B & M agreed to allow the [St. Croix Estates] Mortgage to secure a future advance by some other party. Similarly, by furnishing Heaton with the Cramer Assignment in blank, Cramer also agreed to allow the [St. Croix Estates] Mortgage to secure a subsequent future advance from another party.
 
 
 25
 . . . . .
 
 
 26
 By conditionally accepting the Cramer Assignment, Wrobel agreed with Heaton that the mortgage on [The Dome] would secure payment of the Wrobel Note.
 
 
 27
 Thus, the Wrobel Note is a `future advance' with respect to the [St. Croix Estates] Mortgage as assigned via the B & M Assignment and further assigned via the Cramer Assignment and as ultimately delivered to Wrobel. Therefore, the [St. Croix Estates] Mortgage, as assigned, secures payment of the Wrobel Note notwithstanding the fact that the loan made by Wrobel was not made in connection with the original [F.D.R. Steaks and Maan] Note. It is enough that the parties to the transaction agreed at the time of Wrobel's loan that the [St. Croix Estates] Mortgage, as assigned, would secure that obligation.
 
 
 28
 App. at 21-22 (citation omitted). Additionally, the district court concluded that neither the parol evidence rule nor the statute of frauds barred enforcement of the Wrobel agreement and, for procedural reasons, the court would not entertain Consolidated's argument that the Wrobel loan was usurious. The district court did not reach the issue of whether Wrobel was entitled to an equitable remedy and determined that Consolidated's arguments premised on the Uniform Commercial Code were not relevant in the context of a future advance mortgage.
 
 
 29
 1. What is a Future Advance Mortgage?
 
 
 30
 Virgin Islands statutory law permits future advance mortgages. 28 V.I.Code Ann. § 1032. In the absence of contrary Virgin Islands law, the common law, as expressed in the American Law Institute's Restatements of the Law, fills the gaps in Virgin Islands statutory law. 1 V.I.Code Ann. § 4 (2004). According to Restatement (Third) of Property (Mortgages) (1997), the term "future advances" refers to:
 
 
 31
 [A]ll situations in which a mortgagor's obligation or the amount or value of a mortgagor's secured performance arises or is enlarged after the mortgage becomes effective. Most future advances are sums of money disbursed to the mortgagor by the mortgagee. Typical examples include draws on construction loans and disbursements under secured lines of credit. However, an obligation secured by a mortgage may accrue by virtue of circumstances other than a monetary advance. For example, a mortgage may secure the mortgagor's guarantee of another person's debt. If the other person defaults, the mortgagor's obligation to pay accrues. That sort of obligation is governed by the rules of this and the following sections. Similarly, a mortgagor and a mortgagee may enter into a mortgage to secure a particular debt, and may later agree to extend the mortgage's coverage to other debts, either preexisting or incurred at the time of the modification. Such cases are regarded as future advances.
 
 
 32
 Restatement (Third) of Property (Mortgages) § 2.1 cmt. a (1997). In view of the proliferation of home equity lines of credit the use of future advance mortgages has become quite widespread.
 
 
 33
 The statute authorizing the use of future advance mortgages in the Virgin Islands, 28 V.I.Code Ann. § 1032, reads:
 
 
 34
 (a) Any mortgage or other instrument given for the purpose of creating a lien on real property may, and when so expressed therein or when so expressed in a separate loan agreement specifically referred to therein and incorporated by reference (which loan agreement need not be recorded) shall, secure not only existing indebtedness, but also future advances, whether such advances are obligatory or to be made at the option of the lender, or otherwise, to the same extent as if such future advances were made on the date of the execution of such mortgage or other instrument, although there may be no advance made at the time of the execution of such mortgage or other instrument and although there may be no indebtedness outstanding at the time any advance is made. Such lien, as to third persons with or without the actual knowledge therein, shall be valid as to all such indebtedness as future advances from the time the mortgage or other instrument is recorded as provided by this title. The total amount of the indebtedness that may be so secured may decrease or increase from time to time, but the total unpaid balance so secured at any one time shall not exceed a maximum principal amount which must be specified in such mortgage or other instrument, plus interest thereon, service charges and any disbursements made for the payment of taxes, assessments, or insurance on the property covered by the lien, with interest on such disbursements.
 
 
 35
 (b) Any such mortgage or other instrument, and all such existing indebtedness, future advances and disbursements thereunder, interest thereon, and service charges, shall have preference to and priority over any lien which is subsequent in time to the time such mortgage or other instrument is recorded as provided by this title.
 
 
 36
 Nothing herein shall be construed to limit any agreement between the lender and the borrower as to the time period for the repayment of such existing indebtedness, future advances and disbursement, interest, and service charges.
 
 
 37
 2. Was the St. Croix Estates Mortgage originally a Future Advance Mortgage or did it become one?
 
 
 38
 We begin our determination of the extent, if any, of Wrobel's interest in The Dome with an analysis of the mortgage between St. Croix Estates as mortgagor and Bouwman and Mazur as mortgagees. Bouwman and Mazur assigned their rights under that mortgage to Cramer, and Cramer in turn assigned its rights, derived from Bouwman and Mazur, in blank, though the assignment ultimately was made to Wrobel. The Restatement (Second) of Contracts explains that "an assignment of a right is a manifestation of the assignor's intention to transfer it by virtue of which the assignor's right to performance by the obligor is extinguished in whole or in part and the assignee acquires a right to such performance." Restatement (Second) of Contracts § 317 (1981). Therefore, at most, Bouwman and Mazur could assign to Cramer their right to St. Croix Estates' performance.[15] Similarly, at most, Cramer could assign to Wrobel its right to that performance.[16] Of course, prior to either assignment, St. Croix Estates had completed the performance the mortgage secured as it paid the $500,000 promissory note and Bouwman and Mazur had issued a satisfaction of the mortgage.
 
 
 39
 To determine the nature of the transferred right to performance, we examine the mortgage from St. Croix Estates to Bouwman and Mazur because both assignments assigned "that certain mortgage." App. at 175-76. If the mortgage from St. Croix Estates to Bouwman and Mazur was not a future advance mortgage, then Bouwman and Mazur, and subsequently Cramer, could not have assigned a mortgage which, prior to being assigned, somehow had become a future advance mortgage.
 
 
 40
 The district court relied on Restatement (Third) of Property (Mortgages) §§ 2.1 and 2.4 to determine that Wrobel held a future advance mortgage. Section 2.1, "Future Advances," states in relevant part:
 
 
 41
 (a) A mortgage secures `future advances' if it secures performance of an obligation that comes into existence or is enlarged after the mortgage becomes effective.
 
 
 42
 (b) As between the parties to a mortgage, repayment of future advances will be secured by the mortgage if the parties have so agreed. The agreement need not be in the mortgage and need not be written. If a separate agreement for future advances is made at the time the mortgage becomes effective, but is unwritten, it will be enforceable only to the extent permitted by the Parol Evidence Rule.
 
 
 43
 (c) As against a person acquiring an interest in the mortgaged property subsequent to the mortgage, repayment of future advances will be secured only if an agreement of the kind described in Subsection (b) exists and
 
 
 44
 (1) the mortgage states that repayment of future advances is secured; or
 
 
 45
 (2) the person has other notice of the parties' agreement concerning future advances at the time the interest is acquired; or
 
 
 46
 (3) the mortgage states a monetary amount to be secured.
 
 
 47
 Restatement (Third) of Property (Mortgages) § 2.1 (emphasis added). Section 2.4, entitled "Mortgages Securing Future Advances Not Specifically Described," provides in relevant part:
 
 
 48
 A mortgage may secure future advances that are not made in connection with the transaction in which the mortgage is given, and that are not specifically described in the mortgage or other documents executed as part of that transaction, subject to the following limitations:
 
 
 49
 (a) The parties must have agreed that such future advances will be secured. Whether this agreement must be written and contained in the mortgage is governed by the principles of § 2.1(b) and (c).
 
 
 50
 (b) The advances must be made in a transaction similar in character to the mortgage transaction, unless (1) the mortgage describes with reasonable specificity the additional type or types of transactions in which advances will be secured; or
 
 
 51
 (2) the parties specifically agree, at the time of the making of the advances, that the mortgage will secure them.
 
 
 52
 Restatement (Third) of Property (Mortgages) § 2.4 (1997) (emphasis added).
 
 
 53
 Unfortunately for Wrobel there simply is no expression in the mortgage from St. Croix Estates to Bouwman and Mazur that it will secure future advances. It is true that a written expression that a mortgage secures future advances is not required in the Virgin Islands if the parties have agreed that it will do so. There is, however, no evidence in the record that St. Croix Estates and Bouwman and Mazur at the time of the execution of the mortgage agreed, orally or in writing, that the St. Croix Estates mortgage would secure future advances. In fact, the mortgage states that "if said mortgagor shall pay unto said mortgagee the certain promissory note hereinafter substantially copied or identified, to wit: and shall perform, comply with and abide by each and every the agreements, stipulations, conditions and covenants thereof, and of this mortgage, then this mortgage and the estate hereby created, shall cease, determine and be null and void." App. at 168 (emphasis added). Thus, the only evidence in the record regarding whether the parties to the mortgage originally agreed to create a future advance mortgage explicitly negates any such intent. Finally, on the issue of original intent, we point out that if there were any doubt about whether the original parties to the mortgage intended it to be a future advance mortgage, which there is not, then surely Bouwman and Mazurs' action in issuing satisfactions of the mortgage on October 5, 1989, and then again on November 1, 1989, after it assigned the mortgage, negates that possible intent.
 
 
 54
 Similarly, there is no evidence that St. Croix Estates and Bouwman and Mazur, agreed to transform the mortgage into a future advance mortgage after its creation, particularly at the time that Bouwman and Mazur assigned it to Cramer. The letter from Heaton's attorney to Bouwman and Mazurs' attorney requesting an assignment rather than a satisfaction of the mortgage does not mention the assignment's purpose, for example, to secure a future advance by some other party. In the circumstances, there was no basis for the district court's statement in its September 27, 2002 opinion that "[b]y furnishing Heaton with an assignment of the [St. Croix Estates] Mortgage, B & M agreed to allow the [St. Croix Estates] Mortgage to secure a future advance by some other party." App. at 21. At the risk of being regarded unkind, it seems to us that the court created this finding out of thin air. First, Bouwman and Mazur did not "furnish[ ] Heaton with an assignment." Rather, Bouwman and Mazur signed a document purporting to assign their rights under the original mortgage agreement to Cramer. Second, and more significantly, there is no evidence in the record that Bouwman and Mazur or Cramer contemplated anything other than assignment of Bouwman and Mazurs' rights, whatever they were, under the original mortgage.[17]
 
 
 55
 Moreover, there is no evidence that, whatever may have been in Heaton's mind, when Bouwman and Mazur made the assignment of the St. Croix Estates mortgage that the then owner of the property and thus the mortgagor, St. Croix Estates, agreed to change the mortgage into a future advance mortgage. In fact, the district court in its September 27, 2002 opinion never held that it did.[18] Rather, the court held that "[b]y conditionally accepting the Cramer Assignment, Wrobel agreed with Heaton that the mortgage on [The Dome] would secure payment of the Wrobel Note." App. at 22. But this finding cannot be justified because Heaton never held title to the property and thus was not a party to the mortgage and certainly could not change its terms. After all, we see no basis for us to disregard St. Croix Estates' corporate existence and somehow substitute Heaton for St. Croix Estates as the mortgagor.[19] Furthermore, an assigned mortgage can provide security according to its terms without being converted into a future advance mortgage so that even if the district court had found that Wrobel's agreement was with St. Croix Estates, his mere acceptance of the Cramer assignment would not have converted the mortgage into a future advance mortgage.
 
 
 56
 We emphasize that the mortgagor at all times remained St. Croix Estates, even after it satisfied the mortgage. But the debt Wrobel held was that of Florida Raffles, F.D.R. Holdings and Heaton; Wrobel obtained his October 9, 1992 monetary judgment against those three parties and not St. Croix Estates. The fact is that there simply is no evidence that St. Croix Estates created a future advance mortgage. In this regard we point out that St. Croix Estates adopted a resolution on September 6, 1989, authorizing it to enter into the September 5, 1989 mortgage that we have called the St. Croix Estates mortgage. App. at 71. Wrobel does not point to an equivalent document by which St. Croix Estates converted the mortgage into a future advance mortgage or attempted to give him a lien on The Dome. Overall, we are convinced that the district court was wrong as a matter of law when it found that there was a future advance mortgage in this case. If the original mortgage did not secure future advances, and the mortgagor, St. Croix Estates, did not change its terms, we fail to see how Wrobel, through accepting an assignment of the original mortgage from a previous assignee, could have obtained a future advance mortgage.
 
 
 57
 Though our result does not depend on the point, we also observe that even from Wrobel's perspective it cannot be said that a future advance mortgage was created. Wrobel knew that he was to receive an assignment of the St. Croix Estates mortgage as security but it is not clear that he thought that the St. Croix Estates mortgage directly would secure his loan as a lien. In fact, he left the details of the transaction to Monacelli. There is, of course, no doubt that a mortgagee or a mortgagee's assignee can assign a mortgage as security without converting the mortgage into a future advance mortgage. If there is not a conversion the ultimate assignee's security is simply the mortgagor's obligation to the mortgagee making the assignment.[20]
 
 
 58
 We realize that at the time of the assignment in this case St. Croix Estates already had paid the loan the mortgage secured so that an assignment of its obligation would have been worthless. But this circumstance does not mean that Wrobel must have thought that he was receiving a future advance mortgage because he confirmed in his deposition that "at no time before making this loan [did he make] any kind of inquiry to determine the status of the payments on the original mortgage note." App. at 702. Thus, he did not know that his security was a satisfied mortgage and was worthless. Overall, it is quite clear from Wrobel's deposition that he did not know exactly what his security was beyond being an assignment of the St. Croix Estates mortgage for whatever that was worth. Certainly his testimony at his deposition did not reflect that he believed that through its assignment to him the mortgage would become a future advance mortgage securing his loan. Indeed, we have been surprised in our study of this case by Wrobel's rather casual approach when he made his $212,000 loan.
 
 IV. CONCLUSION
 
 59
 Because we determine that Wrobel did not hold a future advance mortgage, we will reverse the order of March 19, 2004, insofar as it concluded that Wrobel's mortgage was enforceable and superior to Consolidated's interest as a future advance mortgage and remand this case to the district court for further proceedings consistent with this opinion.[21]
 
 
 
 Notes:
 
 
 [1]
 Because Barclays Investments, Inc., the appellant, did not succeed Consolidated Realty Corp. as a party until March 19, 2004, and the events we describe relate to Consolidated rather than Barclays, for clarity we will refer to theBarclays Investments action as the Consolidated Realty action.
 
 
 [2]
 The district court consolidated the two cases by an order dated November 4, 1999, stating that "2. The above referenced cases are consolidated and henceforth the caption shall be as above. 3. This matter is set for `trial' on...." App. at 376-77. In appellee Bruce J. Wrobel's brief he indicates that the November 4, 1999 order "consolidated [the cases] for trial." Appellee's br. at 6. This statement is not quite complete. In fact, the order is entitled "Order of consolidation and for trial" and provides that the cases "are consolidated" without limitation of purpose
 
 
 [3]
 The parties sought additional forms of relief, but we recite only the pertinent relief sought
 
 
 [4]
 Heaton's attorney did not identify whether he was representing Heaton or St. Croix Estates, or both, in his letter. But in an agreement among St. Croix Estates, Consolidated and Heaton, individually, on March 20, 1995, that we describe below, the parties indicated that St. Croix Estates and Heaton requested the assignment. App. at 198. Thus, we regard the attorney as having acted for both St. Croix Estates and Heaton
 
 
 [5]
 The attorney's letter requesting the assignment reads, in relevant part: "As you know, my client now has the right to obtain a satisfaction of the captioned mortgage. My client has requested, however, that the mortgage be assigned, instead, to Cramer Properties, Inc., a Texas corporation. To that end, I have prepared an assignment of mortgage which is enclosed, and an allonge to the note, which as you can see, is without recourse. Please have your clients execute these two documents and return same to me as soon as possible. In the event you have already forwarded to me the satisfaction, I shall hold and return same to you when I have received the assignment. Also, please forward to me the original mortgage and the original note." App. at 174
 
 
 [6]
 Monacelli used the Cramer assignment to secure a short term loan, known as the Washington loan, before he used the assignment to obtain funding for Florida Raffles. The Cramer assignment itself states that the assignment was given to secure payment of a promissory note made by another Heaton company, F.D.R. Washington, Inc
 
 
 [7]
 The Florida action concerned effects from the alleged fraud resulting in the property transaction from Consolidated to St. Croix Estates
 
 
 [8]
 Consolidated thought that its appeal was premature because it believed that the district court's October 7, 2002 order was not a final judgment pursuant to 28 U.S.C. § 1291
 
 
 [9]
 The district court had jurisdiction under 48 U.S.C. § 1612(a) and (b) and, if the appeal is timely, we have jurisdiction under 28 U.S.C. § 1291 and 48 U.S.C. § 1613
 
 
 [10]
 When Consolidated moved in this court to dismiss its original appeal as premature and gave notice of the motion to Wrobel's attorney he did not in any document filed with this court oppose the motion or state that the appeal was not premature. He did, however, notify Consolidated's attorney that in his opinion the appeal had been taken from a final order and thus he requested that Consolidated withdraw its motion to dismiss. He also notified Consolidated's attorney that if there was a later appeal he would challenge appellate jurisdiction. Thus, Wrobel's attorney did not mislead Consolidated's attorney who pursued his motion to dismiss at his own risk
 
 
 [11]
 Neither party asserts that the district court certified the October 7, 2002 as final under Rule 54(b)
 
 
 [12]
 Wrobel contends that the March 20, 1995 agreement rendered theConsolidated Realty action moot but clearly it did not for Wrobel's claim against The Dome arose before its reconveyance to Consolidated and thus, if valid, would survive the reconveyance. Consolidated sought to circumvent this argument by having its original conveyance to St. Croix Estates declared void ab initio.
 
 
 [13]
 In view of our disposition of the jurisdiction issue we need not consider whether we should reinstate Barclays' original appeal
 
 
 [14]
 Inasmuch as the material facts on this appeal are not in dispute, we reject Wrobel's argument that the clearly erroneous standard of review applies to the district court's conclusion that Wrobel held a future advance mortgage on The Dome. Indeed, the lack of factual disputes probably explains why the parties tried this case with stipulations and documents rather than live testimonial evidence. Moreover, the district court started its discussion of the facts in its September 27, 2002 opinion by indicating "[t]he facts as stipulated to by the parties and found by the Court are as follows[.]" App. at 13. What is in dispute is the legal effect the district court gave to those factsSee IPSCO Steel (Alabama), Inc. v. Blaine Constr. Corp., 371 F.3d 141, 147 (3d Cir.2004) (explaining that while factual findings are subject to the clearly erroneous standard, "conclusions drawn with respect to the legal effect of any agreement are, however, questions of law and therefore subject to plenary review"). In any event, even if we used the deferential clearly erroneous standard on this appeal our result would be the same.
 
 
 [15]
 The assignment of mortgage from Bouwman and Mazur to Cramer transfers"that certain mortgage in the original principal amount of $500,000.00 made by ST. CROIX ESTATES, INC., a Delaware corporation, F.D.R. STEAKS, INC., a Florida corporation, and MAAN, INC., a Michigan corporation, mortgagor, in favor of JAMES P. BOUWMAN and RICHARD F. MAZUR, mortgagee...." App. at 175 (emphasis added).
 
 
 [16]
 The assignment of mortgage from Cramer in blank, eventually assigned to Wrobel, transfers"that certain mortgage in the original principal amount of $500,000.00 made by ST. CROIX ESTATES, INC., a Delaware corporation, F.D.R. STEAKS, INC., a Florida corporation, and MAAN, INC., a Michigan corporation, mortgagor, in favor of JAMES P. BOUWMAN and RICHARD F. MAZUR, mortgagee...." App. at 176 (emphasis added).
 
 
 [17]
 We point out that sometimes parties to a mortgage in situations in which the mortgagor can satisfy it provide for the mortgagee to assign the mortgage to the mortgagor so that it remains open on the record for the purpose of affecting priorities of claims against the propertySee Denzler v. O'Keefe, 34 N.J.Eq. 361 (1881).
 
 
 [18]
 In an opinion of April 13, 1998, denying cross motions for summary judgment addressing Wrobel's attempt to obtain a judgment of foreclosure and Consolidated's attempt to secure an order holding that Wrobel did not have a lien on the property, the district court indicated that "there is evidence that the intention of the mortgagor, St. Croix Estates, was to keep the mortgage alive to be used for a subsequent assignment." App. at 138. But a mortgage can be assigned without being converted into a future advance mortgage
 
 
 [19]
 In making this statement we do not disregard the circumstance that Heaton apparently at the times material to this case was St. Croix Estates' sole officer, director and shareholder. App. at 198
 
 
 [20]
 We are not unaware that a mortgagor's obligation ordinarily is stated in an instrument separate from the mortgage, such as a bond or, as in this case, a note, so that the mortgage itself is merely security. Nevertheless, when a mortgage is assigned for use as collateral security we believe that the parties' intention, ordinarily at least, is that the assignee be able to enforce the debt the mortgage secures if the assignor defaults his own debt. As the Restatement (Second) of Contracts § 317 explains, the assignee obtains the assignor's right to the obligor's performance
 
 
 [21]
 In view of our result we need not address Barclays' arguments regarding the effectiveness of the assignments, the application of the Uniform Commercial Code, and equitable estoppel